Craig **RHODES, Charlene Brown, Mark Donham, et al., Plaintiffs–Appellants,**

v.

James **JOHNSON, District Ranger, Vienna District, Shawnee National Forest, Defendant–Appellee.**

No. 97–3687.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1998.

Decided Aug. 27, 1998.

786

Thomas C. Buchele, Steven M. Siros (argued), Karen C. Bruntrager, Jenner & Block, Chicago, IL, for Plaintiffs–Appellants.

Andrew C. Mergen (argued), Department of Justice, Land & Natural Resources Division, Washington, DC, William E. Coonan, Office of the United States Attorney, Civil Division, Fairview Heights, IL, for Defendant–Appellee.

Before MANION, KANNE, and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

The defendant is the U.S. Forest Service's District Ranger for the Vienna District of the Shawnee National Forest in southern Illinois. The plaintiffs are five neighbors of the Burke Branch Research Natural Area—part of the Shawnee National Forest—who use Burke Branch for such activities as hiking and nature photography. They seek declaratory and injunctive relief against the defendant, challenging his authority to burn one area of Burke Branch and remove shrubs from another without conducting an "environmental assessment," which the plaintiffs argue is required by the Forest Service's procedures implementing the National Environmental Policy Act (NEPA), 42 U.S.C. § 4231 *et seq.*, and the Council on Environmental Quality (CEQ)'s regulations. Although the controlled burn and shrub removal are "categorical exclusions" under the Forest Service's implementing procedures, and so would not generally be subject to an environmental assessment, the plaintiffs argue that the mere presence of at least two "extraordinary circumstances" removes the proposed actions from the categorical exclusions.[1] The defendant argues that under the Forest Service's interpretation of its procedures an environmental assessment is not necessary if, after an internal review, the Forest Service determines that the presence of the extraordinary circumstances would not have a significant impact on the environment. The district court accepted the Forest Service's interpretation and so granted summary judgment for the defendant. Because the Forest Service's

---

1. The undisputed "extraordinary circumstances" at issue in this case are the presence of the endangered Indiana bat, and Burke Branch's status as a research natural area.

interpretation contradicts the plain language of its implementing procedures, we reverse.

## I. Background

The Shawnee National Forest covers much of the southern tip of Illinois. Within this large area is the 206–acre Burke Branch Research Natural Area. In 1989, after the Forest Service prepared a Management Plan for Burke Branch, it prepared an environmental assessment of that Plan's impact. (An environmental assessment is one of the studies that an agency may conduct to fulfill its obligations under NEPA and the CEQ's regulations.) As required by regulation, the 1989 environmental assessment was subject to public review and comment. This environmental assessment led the Forest Service to issue a "finding of no significant impact," meaning no further study or documentation was necessary. As part of the Management Plan, the Forest Service conducted controlled burns in Burke Branch in 1990 and 1992.

This 1989 environmental assessment was applicable for five years, but after it expired in 1993, the Forest Service did not conduct a new one. Rather, on August 13, 1996, the Forest Service issued an "environmental analysis," in which it concluded that burns and shrub removal in Burke Branch would not significantly impact the environment. Like the 1989 environmental assessment, the environmental analysis purported to be valid for five years, but unlike an environmental assessment, this analysis was essentially an internal study, not subject to public review. On August 16, 1996, the defendant issued a decision memo recommending controlled burns in a 17–acre area within Burke Branch and removing trees, shrubs, and other selected woody plants from another 10 acres.

On September 18, 1996, the plaintiffs filed this suit, seeking declaratory and injunctive relief against the defendant acting on his decision memo. After the district court denied the plaintiffs' motion for preliminary injunction, both parties filed motions for summary judgment, and on August 28, 1997, the district court denied the plaintiffs' motion and granted the defendant's. The plaintiffs then appealed. Although the defendant has conducted some controlled burns, this case is not moot because the defendant still plans to conduct shrub removals and intends to con- duct future controlled burns in accord with the environmental analysis.

## II. Analysis

We first address an issue not raised by the parties: whether the plaintiffs have standing under Article III of the U.S. Constitution to bring this suit. Even where the parties agree that the plaintiffs have constitutional standing, we have to satisfy ourselves that this jurisdictional requirement is met. *See, e.g., Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir.1997); *Transamerica Ins. Co. v. South*, 125 F.3d 392, 396 (7th Cir.1997). In their jurisdictional statement, the plaintiffs assert federal question jurisdiction because the defendant's decision was unlawful in that in reaching it he failed to follow the required procedures. But *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571–72, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), foreclosed standing based on some sort of "procedural injury," so this assertion can be no help to the plaintiffs. Reviewing the record in this case, however, we are satisfied that the plaintiffs do have standing because they allege that they use Burke Branch, that the defendant's decision will diminish this use and enjoyment, and that the defendant's failure to permit them to participate in the public review of the decision ·is · causally connected to their harm. This is enough to show Article III standing. *See Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Lujan*, 504 U.S. at 562–63, 112 S.Ct. 2130 (citing *Sierra Club*). In the future, we hope that litigants will be mindful of our obligation to satisfy ourselves of our jurisdiction and when, in cases like this, standing is an obvious issue, they will cite to the relevant parts of the record to avoid wasting judicial time and resources. We now turn to the merits of this appeal.

NEPA established a national policy of protecting the environment as a way of promoting human health. 42 U.S.C. § 4321. NEPA also created CEQ, which promulgates regulations related to NEPA that are binding on Federal agencies. 42 U.S.C. § 4342. One of those regulations requires all Federal

agencies to adopt procedures implementing CEQ's regulations and provides that

> [w]hen the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the [CEQ] while developing its procedures and before publishing them in the Federal Register for comment.... The procedures shall be adopted only after an opportunity for public review and after review by the [CEQ] for conformity with the Act and these regulations....

40 C.F.R. § 1507.3. In accord with this regulation, the Forest Service, which is a subunit of the U.S. Department of Agriculture, adopted implementing procedures in its Environmental Policy and Procedures Handbook, FSH 1909.15, which we will refer to as the Environmental Handbook.

The Department of Agriculture adopted environmental regulations to fulfill its NEPA obligations, *see* 7 C.F.R. § 3100.41(e), and the Forest Service's Environmental Handbook is meant to be a layer of agency rules one level below these. *See* Environmental Handbook, section 01.3. Both parties and the district court treated the Forest Service's Environmental Handbook as agency regulations and the Forest Service's interpretation of the Environmental Handbook's provisions as an agency interpreting its own regulations. This appears to be correct because— as required by 40 C.F.R. § 1507.3—the Environmental Handbook was published in the Federal Register, *see* 57 Fed.Reg. 43,180 (Sept. 18, 1992), and was subject to public comment and review. *See Western Radio Services Co. v. Espy*, 79 F.3d 896, 901 (9th Cir.1996) (holding that a different Forest Service Handbook was not binding law because it had not been issued as a regulation in the C.F.R. or been published in the Federal Register). *But see Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir.1996) (stating court's belief that because Forest Service's Environmental Handbook had not been published in the Federal Register, it did not have the independent force and effect of law).

NEPA requires that all agencies make a report on the "environmental impact of the proposed action" whenever the agency proposes action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). CEQ's regulations refer to this report as an "environmental impact statement," 40 C.F.R. § 1508.11, and direct agencies to establish implementing procedures to determine which actions "normally require[ ] an environmental impact statement." 40 C.F.R. § 1501.4(a)(1). Environmental impact statements are detailed reports completed after a thorough analysis and study. The CEQ regulations also direct agencies to adopt implementing procedures to determine which actions normally do not have any significant impact on the environment and so need not be the subject of any study or report; these actions are referred to as "categorical exclusions." 40 C.F.R. § 1501.4(a)(2). If a proposed action is neither one normally requiring an environmental impact statement nor one normally a categorical exclusion, the agency must prepare an "environmental assessment," 40 C.F.R. § 1501.4(b), which is "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Cronin v. United States Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990). An environmental assessment leads either to a "finding of no significant impact"—as the Forest Service's 1989 environmental assessment relating to Burke Branch did—in which case no environmental impact statement need be prepared, or to a finding that the project will have a significant impact, in which case an environmental impact statement is required. 40 C.F.R. § 1501.4(c) & (e).

For categorical exclusions, CEQ's regulations provide:

> "Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the

human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ([40 C.F.R.] § 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.... *Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.*

40 C.F.R. § 1508.4 (emphasis supplied). The Forest Service chose to designate numerous actions as categorical exclusions. Environmental Handbook, sections 31.1 & 31.2. Among those actions are "Timber stand and/or wildlife habitat improvement activities," examples of which include "[t]hinning or brush control" and "[p]rescribed burning." Environmental Handbook, section 31.2(6). Thus, both parties agree that the controlled burns and shrub removal at issue here would normally be categorical exclusions for which neither an environmental impact statement nor an environmental assessment are needed. But the issue has one more complication because the Forest Service, as directed by CEQ, has identified for its categorical exclusions "extraordinary circumstances" that "may have a significant environmental effect." Those extraordinary circumstances "include, but are not limited to, the presence of ... [t]hreatened and endangered species ... [and] ... Research Natural Areas." Environmental Handbook, section 30.3(2). The defendant concedes that at least these two extraordinary circumstances are present in Burke Branch, which is the home of the endangered Indiana bat and is a Research Natural Area.[2]

■ Thus, there is no dispute that the proposed actions here are categorical exclu-

sions but that there are also present at least two extraordinary circumstances that "may have a significant environmental effect." The dispute between the parties is what this combination means. Under the Forest Service's interpretation, so long as it concludes after an internal review that the extraordinary circumstance will not have a significant impact on the environment, it need not prepare any further environmental studies. The plaintiffs argue that the plain language of the procedures requires an environmental assessment whenever an extraordinary circumstance is present.

■ Under the Administrative Procedures Act, we may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our exact standard of review depends on the kind of action a litigant challenges. Here, the plaintiffs challenge the Forest Service's interpretation of its own implementing procedures, which we will treat as Forest Service regulations. "We must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The Court explained that "we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* (citations and internal quotations omitted). As we have said, the power of an agency to interpret its own regulations "must not be confused with the power to rewrite." *Pettibone Corp. v. United States,* 34 F.3d 536, 541 (7th Cir.1994). " '[D]eference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the

---

2. A research natural area is one that the Chief of the Forest Service designates "to illustrate adequately or typify for research or educational purposes, the important forest and range types in each forest region." 36 C.F.R. § 251.23. The Burke Branch Research Natural Area was designated to typify the rare mesic barrens range. Research natural areas "will be retained in a virgin or unmodified condition except where measures are required to maintain a plant com-

munity which the area is intended to represent." *Id.* The defendant believes that the burning and shrub removal are necessary to maintain the mesic barrens community in Burke Branch.

The Indiana bat has a maternity period lasting from the beginning of May to the end of August each year. The defendant's decision memo calls for the controlled burns either to be delayed until after the maternity period or measures be taken to protect the bat roosts from the burning.

principles of construction courts normally employ.' " *Id.* at 541 (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring in part and concurring in judgment)) (alteration by quoting court).

The Environmental Handbook has three different formulations regarding how categorical exclusions and extraordinary circumstances work together. First, a flow chart, which we have appended to our decision, lays out the Forest Service's implementing procedures. The chart indicates that an action falls into a categorical exclusion if it fits an exclusion "and has No Extraordinary Circumstances," but if a proposed action "has Extraordinary Circumstances," further analysis is required. Second, the Environmental Handbook explains that "if the proposed action does not involve any extraordinary circumstances ... the action may be categorically excluded from documentation in an [environmental impact statement] or [environmental assessment]." Section 11.6. And third, the Environmental Handbook states that a categorical exclusion applies "only if" "there are no extraordinary circumstances related to· the proposed action." Section 30.3(1).

We conclude that the presence of an extraordinary circumstance requires the Forest Service to prepare an environmental assessment. This is compelled by the plain language of the Environmental Handbook. The flow chart unambiguously sets out two possible paths when a categorical exclusion applies: either the proposed action "has No Extraordinary Circumstances," and so no further analysis is required, or it "has Extraordinary Circumstances," in which case an environmental assessment is required. The flow chart leaves no room for the third possibility created by the Forest Service's interpretation: an internal review that serves the same purpose as, and so replaces, an environmental assessment. Similarly, the dichotomy expressed by the plain language of section 11.6 is between actions that "involve" extraordinary circumstances and those that do not. "Involve" means extraordinary circumstances exist. It is not enough that the Forest Service has conducted an internal review to determine whether the extraordinary circumstance will cause the proposed action to have a significant impact on the environment. An environmental assessment is the process required to make that determination. The same holds true for section 30.3(1)'s stating that a categorical exclusion applies only if there is no extraordinary circumstance "related to" the proposed action. With extraordinary circumstances undisputably present, a categorical exclusion cannot apply.

We therefore conclude that the plaintiffs' interpretation is compelled by the regulations' plain language: a proposed action "has" or "involves" an extraordinary circumstance, or the extraordinary circumstance is "related to" the proposed action, whenever an extraordinary circumstance is present. Indeed, the Environmental Handbook states that extraordinary circumstances "include ... *the presence*" of the circumstances listed. Section 30.3(2) (emphasis supplied). The Forest Service is required to conduct an environmental assessment before conducting controlled burns or shrub removal in Burke Branch, so the defendant's decision to conduct those actions without an environmental assessment is "otherwise not in accord with the law," 5 U.S.C. § 706(2)(A), and therefore must be held "unlawful and set aside." *Id.*

Because we find the Environmental Handbook's plain language dispositive of this issue, we find no need to review its drafting history as the defendant urges us. But we wonder why he would even direct our attention there because this history strongly supports the plaintiffs' interpretation. In response to public comments that had raised the concern that it was not clear whether the mere presence of an extraordinary circumstance would remove the proposed action from the categorical exclusion, the Forest Service stated that "section 30.3, Policy, has been revised to clarify that an action may be categorically excluded only if it falls within a category and is without extraordinary circumstances." 57 Fed.Reg. 43,183. This language unambiguously shows that the plaintiffs' demand for an environmental assessment is what the regulations require.

Before closing, we wish to emphasize that our ruling today has no bearing on the merits of the defendant's decision to conduct controlled burns and shrub removal in Burke Branch. Undoubtedly by following the requirements of the Forest Service's implementing procedures, the defendant could arrive at the same decision. But however right the defendant's decision may be, in reaching it he must comply with his own agency's procedures and produce an environmental assessment.

### III. Conclusion

For the reasons stated above, the district court's grant of summary judgment for the defendant is reversed and the case remanded for further proceedings consistent with our opinion.

792

ATTACHMENT

# APPENDIX

06 - Exhibit 01

NEPA PROCESS OVERVIEW

